23-129-cr (L)
*United States v. Iotova*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 23rd day of December, two thousand twenty-four.

Present:

> ROBERT D. SACK,
> WILLIAM J. NARDINI,
> EUNICE C. LEE,
> *Circuit Judges*.

UNITED STATES OF AMERICA,

> *Appellee*,

v.                                                                                       23-129-cr, 23-6148-cr,
                                                                                         23-6149-cr

ANTOANETA IOTOVA, ISSAK ALMALEH, a/k/a Issak Izrael,

> *Defendants-Appellants*.

For Appellee: MATTHEW J. KING (Rebecca T. Dell, Nathan Rehn, *on the brief*) Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY.

1

| | |
|---|---|
| For Defendant-Appellant Antoaneta Iotova: | ELIZABETH M. JOHNSON, Law Offices of Elizabeth M. Johnson, New York, NY. |
| For Defendant-Appellant Issak Almaleh: | Marsha R. Taubenhaus, Esq., New York, NY. |

Appeals from judgments of conviction of the United States District Court for the Southern District of New York (Edgardo Ramos, *District Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED**.

Defendants-Appellants Antoaneta Iotova and Issak Almaleh (the "defendants") appeal from judgments of conviction entered on January 31, 2023, in the United States District Court for the Southern District of New York (Edgardo Ramos, *District Judge*), following a jury trial. A superseding indictment filed on December 6, 2021, charged the defendants with four counts: conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); mail fraud, in violation of 18 U.S.C. §§ 1341 and 2 (Count Two); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Three); and making false statements to the Federal Deposit Insurance Corporation ("FDIC"), in violation of 18 U.S.C. §§ 1007 and 2 (Count Four). The government alleged that the defendants engaged in a multi-year scheme in which they falsely claimed to work on behalf of a bank, created fake deeds to fraudulently transfer the ownership of dozens of properties in Florida and New York to entities that they controlled, and purported to rent those properties to people who were later forced to leave the properties when the true owners realized what had happened. Both defendants argued that they lacked the state of mind to defraud because they had a sincere belief in their right to rent the properties.

A jury trial began on March 3, 2022, and ended on March 17, 2022, when the jury found both defendants guilty on all four counts. On January 20, 2023, the district court sentenced each

defendant principally to time served and three years of supervised release. The defendants now appeal their convictions, arguing that the district court made several erroneous evidentiary rulings—both of admission and exclusion—that deprived the defendants of a fair trial. We assume the parties' familiarity with the case.

We review a district court's evidentiary rulings for abuse of discretion and will reverse "only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018).[1] Even if a decision was "manifestly erroneous," however, we will affirm the decision so long as the error was harmless. *Id.*; *see also United States v. Dhinsa*, 243 F.3d 635, 649–50 (2d Cir. 2001).

### I. Alleged Errors of Admission

The defendants contend that the district court abused its discretion by admitting several categories of evidence offered by the government. As set forth below, we discern no error warranting reversal.

#### A. Admission of Tenants' Testimony That They Had Been "Scammed"

The defendants argue that the district court erroneously admitted the testimony of several tenant witnesses that they had been "scammed." Tenant F'lesson Wood testified that he had rented a house in Florida from the defendants based on an online listing, but that he lived in the house only for a few weeks because it "turns out that that house was a scam." Iotova App'x 226. He testified that the police forced his family to leave the house, and that he then texted Iotova to ask for his money back. In one message, he told Iotova that the house was "a scam." *Id.* at 244. Additionally, tenant Julie Rivera testified that, after she learned that the apartment she had rented

---

[1] Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

3

from Iotova was going to be demolished, she told her daughter that she had been "scammed" and that she needed her daughter's help to confront the defendants. *Id.* at 363. Rivera stated that she and her daughter then arranged to meet the defendants at another property that the defendants had listed for rent; once there, she demanded her money back and called the police. The defendants argue that the tenant witnesses' testimony that they had been "scammed" was inadmissible for two reasons: first, the statements were "more prejudicial than probative" under Rule 403 of the Federal Rules of Evidence; second, the statements constituted improper lay opinion testimony under Rule 701 because they expressed the witnesses' opinions on "exactly the issue to be decided by the jury." Iotova Br. 30. We find neither argument to be persuasive.

Rule 403 provides that a court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Evidence is unfairly prejudicial within the meaning of Rule 403 "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013). We "accord great deference to the district court's assessment of the relevancy and unfair prejudice of proffered evidence." *United States v. Morgan*, 786 F.3d 227, 229 (2d Cir. 2015). Accordingly, when evaluating a district court's decision to admit evidence under Rule 403, we "generally maximize its probative value and minimize its prejudicial effect." *United States v. Coppola*, 671 F.3d 220, 245 (2d Cir. 2012).

Applying these principles, we conclude that the testimony of Woods and Rivera was not barred under Rule 403. Woods's statement that he believed that the "house was a scam" explained why he had contacted Iotova to demand his money back. His additional testimony that he had told Iotova that the house "was a scam" was relevant because it showed that she had been put on notice that the apartment she had rented out might not in fact have been owned by her, and that the tenant

4

who had paid her to rent the apartment had been unable to occupy it. *See United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). Similarly, Rivera's testimony that she had told her daughter that she had been scammed laid a foundation for her subsequent testimony regarding her confrontation with the defendants, which was admissible to demonstrate notice, as described above. The district court did not abuse its discretion by deciding that the probative value of the tenant witnesses' reference to having been "scammed" was not substantially outweighed by any danger of unfair prejudice.

Further, we conclude that the challenged testimony of Woods and Rivera was fact testimony, rather than lay opinion testimony, and that it was properly admitted. A lay witness may provide relevant fact testimony provided that "the witness has personal knowledge" of the issues. *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013). Here, the testimony of Woods and Rivera that they had been scammed was proper fact testimony because it described their state of mind concerning their experiences with the defendants. *See United States v. Morton*, 391 F.3d 274, 277 (D.C. Cir. 2004) ("A witness's testimony about his own state of mind is not opinion testimony."). That testimony was offered not to prove that they had, in fact, been scammed, but to provide context for the actions that they took because they believed that they had been scammed. For that reason, the testimony was also plainly relevant.

### B. Admission of Denise Torres's Testimony Regarding Her Encounter with the Police

The defendants also challenge the admission of certain elements of Denise Torres's testimony regarding her encounter with police officers at the apartment that she and her husband had paid the defendants to rent. Torres testified that as she and her husband were moving into the

apartment, police officers, while "holding . . . guns," "order[ed] us to come out with our hands above our head . . . and they escorted us out of the apartment and placed us in handcuffs." Iotova App'x 427. According to Torres, the officers explained that she and her husband were living in the apartment "illegally." *Id.* at 435. Further, she testified that after the officers released them, she called Iotova and told her that she and her husband had been "held up at gunpoint by police" and that Iotova "wasn't the owner of the place." *Id.* at 438. Torres stated that she then asked for her money back, but Iotova "really didn't have much to say" in response. *Id.* The defendants argue that the district court abused its discretion by admitting two "extraneous and inflammatory details of the police response"—first, that the officers were holding guns when they confronted Torres and her husband, and second, that the officers handcuffed them. Iotova Br. 34.

The district court did not abuse its discretion by permitting those elements of Torres's testimony. That context was "legally and morally relevant to the conduct constituting the offenses committed" by the defendants. *United States v. Velazquez*, 246 F.3d 204, 211 (2d Cir. 2001). Indeed, the fact that the police approached Torres and her husband at gunpoint and then handcuffed them underscored that the defendants did not own the property in question and that the victims were harmed by the defendants' fraudulent actions. Torres's recounting of these facts starkly put Iotova on notice that she did not own the apartment. Further, the fact that Iotova "really didn't have much to say" in response to Torres's description of the police response was probative of Iotova's knowledge that the defendants did not own the property. *See Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) ("[I]n proper circumstances silence in the face of accusation is a relevant fact . . . .").

### C. Admission of FDIC Examiner's Testimony that the Defendants' Application Was "Most Likely Fraudulent"

Iotova challenges the admission of opinion testimony offered by Ernest Garibaldi, an FDIC

6

examiner in the New York regional office who reviewed the defendants' application to register Deutsche Bank National Trust Company ("DBNTC"), for which the defendants claimed to work, as an FDIC-insured bank. At trial, Garibaldi testified that the FDIC did not approve the application and returned it to the defendants as incomplete, and he flagged particular problems with the application. When the prosecutor asked Garibaldi why the FDIC did not approve the application, he stated that he and his supervisor assessed that it was "most likely fraudulent." Iotova App'x 829. Iotova's counsel objected to this statement as a "legal conclusion," but the district court overruled the objection. *Id.* On appeal, Iotova argues that this statement was inadmissible as lay opinion testimony under Rule 701 because it was not helpful to the jury, and that it was also inadmissible under Rule 403 because it was "more prejudicial than probative." Iotova Br. 30. Iotova also argues that Garibaldi's reference to his supervisor's opinion was inadmissible as hearsay. *Id.* at 31; Iotova Reply Br. 10.

Even assuming that the district court erred by admitting Garibaldi's statement, we conclude that any error was harmless because Garibaldi went on to testify at length about the deficiencies and abnormalities in the application, which he said raised "many, many red flags" about the veracity of the information contained therein. Iotova App'x 839. For example, he stated that the application was unsigned; had no letterhead; did not provide the biographies of DBNTC's directors and officers; lacked a required certification; and was replete with misspelled words, grammatical errors, and formatting issues. He also testified that after he had returned the application to the defendants as incomplete, they declined to meet with officials from the FDIC's New York office to address the application's deficiencies and instead submitted the same application to a different regional office—actions, he said, that were atypical. Considering Garibaldi's full testimony and other uncontested evidence concerning the defendants' application, we conclude that the district

court's decision to admit the challenged statement, even if erroneous, was "unimportant in relation to everything else the jury considered" on the question of whether the defendants had made false statements to the FDIC. *United States v. Paulino*, 445 F.3d 211, 219 (2d Cir. 2006).

### D. Admission of Testimony Regarding "Uncharged Misconduct"

Iotova also argues that the district court erred by admitting the following four "statements made by out of court declarants of uncharged bad acts by the defendants." Iotova Br. 35. First, Rivera testified that when she visited the apartment that she had ostensibly rented from the defendants, the neighbor who lived next door came into the hallway and said, "Oh, my God, they got you too." Iotova App'x 363. Second, Torres testified that while police officers were removing her and her husband from the apartment that they had ostensibly rented from the defendants, the property manager arrived and informed the officers that Torres and her husband "were just a victim" and "weren't the first people" to fall prey to the defendants' scheme. *Id.* at 436. Third, with respect to the same incident, Torres testified that the property manager warned that "she's had encounters with [Almaleh] and he's aggressive." *Id.* Finally, Jennifer Patterson, another tenant witness, testified that the "true owner" of the house that she had ostensibly rented from the defendants told her that "the key [to the house] was stolen . . . in New York." *Id.* at 507. Iotova contends that the district court should have excluded each of these statements as inadmissible hearsay, or under Rule 403—because, even accepting the non-hearsay purposes that the government proffered in support of their admission, the statements were substantially more prejudicial than probative.

We need not decide whether each statement was properly admitted because we conclude that even if the district court admitted all four statements in error, the errors were harmless. None of the challenged statements went "to the heart of the case against the defendant[s]," and the

government's other evidence was overwhelming. *United States v. Rigas*, 490 F.3d 208, 222 (2d Cir. 2007). In Iotova's opening brief, she effectively concedes facts that constitute substantial evidence of the defendants' guilt even excluding all the evidence that the defendants challenge on appeal. For example, she states: "All of the tenants testified in detail about renting properties from defendants, paying for them in cash, and then within a short period of time learning that they could not stay in the properties. They also testified that they made efforts to contact the persons who had rented them the properties in order to get their money back, but that they did not get refunds." Iotova Br. 30 (citations omitted); *see also id.* at 37 ("Every [tenant] witness . . . also testified that they rented property from the defendants, paid cash up front, and that they were not able to actually live in the properties—they were removed by the police, they were told the property was scheduled for demolition, or told it belonged to someone else."). Moreover, the government introduced evidence showing, among other things, that: the defendants repeatedly used fake names during the scheme, employees of DBNTC stated that the defendants did not work there, the defendants did not claim to work for DBNTC on their tax returns, the defendants' residence contained evidence that they had doctored property deeds, and the defendants declined to meet with the FDIC to address the agency's concerns about their application. Given the totality of the evidence that the defendants do *not* challenge, we conclude with "fair assurance that the jury's judgment was not substantially swayed by" any hypothetical error. *Paulino*, 445 F.3d at 219.

### E. Admission of Default Judgments

Iotova also argues that the district court abused its discretion by admitting complete, unredacted versions of three default judgments issued against the defendants rather than ordering the redaction of certain "highly prejudicial" judicial findings that constituted inadmissible hearsay or, in the alternative, were inadmissible under Rule 403. Iotova Br. 41–44. Each of the default

9

judgments declared that certain deeds that the defendants had used to transfer property from DBNTC to an entity that they controlled were invalid or fraudulent. The district court admitted the documents subject to this limiting instruction: "These documents are not put before you for the truth of the information in the documents, but rather to the extent that you believe they serve to provide notice to the defendants of the information that is contained therein." Iotova App'x 681. The district court later reiterated this instruction.

The admission of the default judgments was not an abuse of discretion. The district court admitted the default judgments for the proper non-hearsay purpose of demonstrating that the defendants were put on notice that they did not own certain properties that they purported to own. *See United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013). Moreover, "the law recognizes a strong presumption that juries follow limiting instructions," *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006), and we see no basis to conclude that the jury failed to abide by the district court's twice-issued instruction here. And even if the district court had erred in admitting the default judgments, any error would have been harmless because there was ample other evidence that the defendants had notice that they were not the rightful owners of the properties, as discussed in Section I.A *supra*.

## II. Alleged Errors of Exclusion

The defendants also challenge the district court's exclusion of three categories of proffered defense evidence. For the reasons set forth below, we conclude that the district court did not abuse its discretion.

### A. Exclusion of Defense Evidence Regarding Failure of Service

First, Iotova argues that the district court erroneously excluded sworn affidavits of service showing that other parties had unsuccessfully attempted to serve certain documents on the

defendants at the outset of the proceedings that led to the default judgments. The defendants offered those documents to rebut the government's argument that they had received the default judgments and were therefore on notice that they did not own the properties in question. But again, even if these affidavits were relevant and not hearsay, any error in their exclusion was harmless because of the other evidence that the defendants had sufficient notice that they were not the rightful owners of the properties.

### B. Preclusion of Defense Questioning Regarding the 2007–08 Financial Crisis

Second, Almaleh argues that the district court erroneously prohibited the defendants from questioning government witnesses about "the role that banks and mortgage companies played in the [2007–08] mortgage/foreclosure crisis." Almaleh Br. 94–95. At trial, the defense asked government witness Mila Schwartzreich, the general counsel for the Broward County Property Appraiser's Office, about the "many problems with foreclosures and . . . mortgages after the foreclosure crisis" and about settlements in litigation between states and several large financial institutions, among other related questions. Iotova App'x 730–31. The district court sustained the government's objection to this line of questioning for two reasons—first, Schwartzreich was not "aware of these issues beyond . . . [what] any person in this courtroom would be aware of," and second, the questions constituted "nitpicking victim blaming" by suggesting that the purported misconduct of DBNTC, or other financial institutions, was relevant to the defendants' actions. *Id.* at 736. The district court did not abuse its discretion by excluding this line of questioning under Rules 401 and 403 because it was plainly beyond the scope of the witness's knowledge, had no bearing on the charged conduct, and created a substantial risk of confusing the issues.

11

### C. Preclusion of Defense Evidence of Defendants' Emails and Legal Complaints

Finally, Almaleh argues that the district court abused its discretion by excluding "a number of the defendants' emails sent to government officials, as well as legal complaints they filed, complaining that others were attempting to steal real estate from them and seeking to legally establish their ownership of the disputed properties." Almaleh Br. 98. The district court excluded these documents as inadmissible hearsay. Almaleh contends that the district court erred because the documents were being offered "for a non-hearsay purpose: to show that the defendants[] did not have the specific intent to defraud." *Id.* He further contends that the proffered evidence showed that "he genuinely believed" that "the [disputed] properties had actually been stolen from" him, and that that belief "was longstanding and was not something he had recently invented in order to rebut the government's charges." *Id.* at 98–99.

The district court did not abuse its discretion by excluding the proffered emails and court filings. Even if these documents were not offered for their truth, it would have been well within the district court's discretion to conclude that any incremental probative value from the non-hearsay purpose of the documents was substantially outweighed by their risk of confusing and misleading the jury because the documents alleged wide-ranging misconduct, harassment, and terrorism by government officials and others. *See United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994).

Moreover, even if the district court erred by excluding that evidence, the error was harmless. Considering the overwhelming evidence of the defendants' fraudulent intent, we are confident that the exclusion of the proffered emails and court filings did not substantially sway the jury's judgment. *See Paulino*, 445 F.3d at 219.

\* \* \*

13

We have considered the defendants' remaining arguments and find them to be unpersuasive. Accordingly, we **AFFIRM** the judgments of the district court.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk